IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JERRY MCCLURE, DAMIEON F.       *
JACKSON, IRA NICHOLSON, GREGORY  *
HIGGINS, BOB H. MILSAP, ANTHONY    *
OATES, BRIEN HARRIS, JAMES         *
CLEVELAND, DEMETRIUS CHISM,       *
CAROLYN CRAIG, KEM AUSTIN,        *
DARRELL DAVIS, BERNARD ROSEBY,   *
DENIOUS HOUSTON, CALVIN CARTER,  *
ROY DANIELS, RANDY CHAPMAN,     *
MALACHI HARSHAW, and FREDERICK  *
WILLIAMS,                          *
             Plaintiffs,        *
                          *
vs.                          *     No. 4:10CV01172 SWW
                          *
DR. LINDA WATSON, Individually and in  *
her Official Capacity as Superintendent of  *
Schools of the Little Rock School District;  *
LITTLE ROCK SCHOOL DISTRICT;     *
LITTLE ROCK SCHOOL DISTRICT BOARD *
OF EDUCATION; WAYNE ADAMS,     *
Individually and in his Official Capacity as  *
Director of Maintenance and Operations of  *
the LITTLE ROCK SCHOOL DISTRICT; and *
KEVIN YARBERRY, Individually and in his  *
Official Capacity as Supervisor of      *
Maintenance and Operations of the Little  *
Rock School District,            *
                          *
             Defendants.       *

**Memorandum Opinion and Order**

Before the Court is defendants' motion for summary judgment to which plaintiffs

responded.  Defendants filed a reply to the response and plaintiffs filed a surreply.  For the

reasons stated below, the Court finds the motion for summary judgment should be granted.

I.

Plaintiffs are African Americans who work in the Maintenance and Operations Department ("MOD") of the Little Rock School District ("LRSD").  The MOD operates out of a warehouse located at 3601 South Bryant Street in Little Rock.  The MOD is responsible for the physical maintenance of the buildings and grounds owned by the LRSD as well as the LRSD's fleet of vehicles.  This includes maintenance of the heating and air systems, the plumbing, the electrical systems, alarm systems, and the door and locks.[1]

Separate defendant Wayne Adams has been the Director of MOD since 2006.  Separate defendant Kevin Yarberry was employed by the District from 2008 to November 2011 as the Maintenance Supervisor.  Employees of the LRSD are paid on a salary scale.  Each position within the LRSD is assigned a salary class or salary grade.  That grade is approved by the LRSD Board of Directors and is based on the skill required for the position and the complexity of the job duties.[2]  In the MOD, employees are paid pursuant to five classifications.  In descending order, they are: foreman, trade specialist, trade, trade helper, and labor.[3]

Plaintiffs allege the LRSD operates the MOD in a racially discriminatory manner and that the LRSD Board of Directors is aware of the MOD's unlawful practices and refuses to correct the situation.  They claim the warehouse is divided into separate sections for the white and black employees, that the two out of ten black foremen supervise racially identifiable work crews, and that white employees earn higher pay, better benefits, and more opportunity for

---

[1]Defs.' Statement of Material Facts Not in Dispute and Pls.' Response [docket entries 35 & 38] at ¶ 1.

[2]*Id*. at ¶¶ 2-4.

[3]Defs.' Mot. Summ. J., Ex I (Adams Aff.) at ¶ 10.

advancement.  They complain black employees get inferior equipment, that hiring is based on subjective job qualifications, and that black employees have greater education and experience than white employees.  Plaintiffs also assert individual claims alleging denial of promotions, demotions, and discriminatory pay based on race.[4]

Defendants move for summary judgment, arguing plaintiffs fail to establish a *prima facie* case of race discrimination for disparate treatment, fail to present evidence that defendants' stated reasons are a pretext for intentional discrimination, and fail to establish they were subjected to a hostile work environment.

## II.

### Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v.  Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The non-moving party may not rest on mere allegations or denials of his or her pleading but must "come forward with 'specific facts showing that there is a genuine

---

[4]Plaintiff McClure is the only plaintiff who alleged he was subjected to a hostile work environment.  Compl. at ¶ 15a.  He does not challenge defendants' motion for summary judgment on his hostile work environment claim.

issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).  Summary judgment "is a useful pretrial

tool to determine whether any case, including one alleging discrimination, merits a trial."

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8ᵗʰ Cir. 2011).

III.

A plaintiff in an employment action may survive a motion for summary judgment by

presenting direct evidence indicating unlawful discrimination or by creating an inference of

unlawful discrimination under the burden-shifting analysis set out in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).[5]  Under *McDonnell Douglas*, a plaintiff must first establish a

*prima facie* case of discrimination.   To meet his burden, a plaintiff must show the following: (1)

that he is a member of a protected class; (2) that  he was meeting the employer's legitimate job

expectations; (3) that  he suffered an adverse employment action; and (4) that similarly situated

employees outside the protected class were treated differently.  *Takele v. Mayo Clinic,* 576 F.3d

834, 838 (8ᵗʰ Cir. 2009); *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-4 (8ᵗʰ Cir. 2012).  If

the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the employer to

articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* at 802.  If it does so, the

burden of production shifts back to the plaintiff to show that the employer's reason is pretext for

unlawful discrimination.  *Id.*  The burden of proof remains at all times with the plaintiff to

establish that he or she was the victim of unlawful discrimination.  *St. Mary's Honor Ctr. v.*

*Hicks,* 509 U.S. 502 (1993).  With this analysis in mind, the  Court addresses each plaintiff's

claims separately and then their general complaints about work conditions.

---

[5]The Eighth Circuit analyzes Title VII and §§ 1981 and 1983 claims under the same framework.
*Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688, 692 n.3 (8ᵗʰ Cir. 2009).

**Jerry McCLure**

Plaintiff Jerry McClure began working in the LRSD in 1985 as the assistant head custodian at Hall High School.  He worked at Hall High until 1987 when he was promoted to building engineer at J.A. Fair High School.  In approximately 1996, McClure was promoted to a position in the heating and air department.  Plaintiff McClure worked in that job for about one year.[6]

In approximately 1999, McClure was promoted to mechanical preventative maintenance foreman.  He testified he supervised the building engineers of the LRSD's five high schools and two of its middle schools.  He said he supervised as many as thirteen people in his position from July 1999 to January 22, 2010.   In 2008, McClure applied for the maintenance and materials supervisor position in the MOD.  Among the qualifications listed were at least five years of supervisory experience and experience with a computerized multi-site work-order, preventative maintenance, utilities, and planning system.[7]  Separate defendant Adams interviewed McClure during the first round of interviews.  Mr. Adams testified the LRSD was looking to enhance energy management, specifically the ability to control the HVAC systems in the schools through computerization.   Mr. Adams said he had no knowledge that McClure possessed experience in an energy management utility system.[8]  Mr. Adams interviewed all LRSD employees who applied for the position whether they possessed the requisite supervisory experience or not.

Mr. Adams hired separate defendant Kevin Yarberry for the position.  Mr. Yarberry had

---

[6]Defs.' Statement of Material Facts Not in Dispute , ¶¶ 5-8.

[7]*Id*. at ¶ 11.

[8]Defs.' Mot. Summ. J., Ex. K (Adams Dep.) at 75-76.

worked as a facilities manager for St. Vincent Hospital.  His duties at the hospital included

maintaining automation controls for HVAC, lighting, and power plant equipment.  Separate

defendant Yarberry testified he was responsible for managing various aspects and facilities for

all the hospital's properties and clinics.[9]  Plaintiff McClure alleges his objective qualifications

exceeded those of Yarberry, and that McClure was entitled to preference because of the LRSD's

practice of promoting from within.   He claims defendants denied him the position because of his

race.

Mr. McClure filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on January 22, 2010.  He complained that on December 1, 2009,

Yarberry informed him that he needed to move McClure to another office to make space for

some computer equipment.   Mr. McClure said he had occupied his office since 2003 and that

Yarberry's decision to move him to a smaller office and give McClure's office to Yarberry's

newly-hired friend,  Mike Ellis, a white male, was based on race.[10]

Plaintiff McClure further complains that on January 22, 2010, Yarberry informed him

that he was assigning McClure to be the foreman of a newly organized preventative maintenance

crew.  Mr. McClure alleges this reassignment was a constructive demotion and was in retaliation

for filing his EEOC charge.[11]

After January 22, 2010, McClure's new assignment included supervising a team of three

---

[9]*Id*, Ex. BB (Yarberry Dep.) at 9.

[10]*Id*., Ex. F (McClure's EEOC Charge); Pls.'Resp. in Opp'n. to Mot. Summ. J., Ex. 1 (McClure Aff.) at ¶ 6.

[11]Compl. at ¶ 15.

employees, Damieon Jackson, Richard Buckalew, and Janine Houston. This new crew, which Yarberry referred to as the "tiger crew," was in charge of cleaning all mechanical rooms and electrical closets within the LRSD pursuant to a directive of the Arkansas Department of Education. Mr. McClure's crew also was to make all necessary repairs to ballasts, ceiling tiles, and junction box covers. The new crew also was instructed to document all leaks and other safety hazards including drive belt covers, fire extinguisher covers and unlocked doors and other needed repairs.[12] Plaintiff McClure said Houston, who is white, later was transferred back to the paint crew, and after February 18, 2010, Buckalew, who is white, never reported to work with McClure's crew. When McClure complained in March 2010, that he was short-handed because of Buckalew's absence, Yarberry told him he would get another worker to replace Buckalew. A few days later, Yarberry told McClure he had changed his mind and that Buckalew would not be replaced. Plaintiff McClure says that in the meantime, Harold Jump, the foreman of the civil preventative maintenance crew and a white male, had two additional men added to his already all-white crew.[13] On March 11, 2010 , McClure amended his EEOC charge to include a retaliation claim.[14]

*Denial of Promotion*

Defendants argue they are entitled to summary judgment on McClure's claim that he was denied a promotion to the maintenance and material supervisor position because of race. They assert he cannot establish a *prima facie* case because he cannot show that he was qualified for

---

[12]Defs.' Mot. Summ. J., Ex. J (Yarberry Aff.) at ¶¶ 6-9.

[13]Pls.' Resp. in Opp'n. to Mot. Summ. J., Ex. 1 (McClure Aff.) at ¶¶ 3-4.

[14]*Id*. at ¶ 5.

the position.  Further, even if he could establish a *prima facie* case, McClure cannot show pretext.

The evidence establishes that two important qualifications for the supervisor position were at least five years of supervisory experience and experience with a computerized multi-site work order, preventative maintenance, utilities, and planning system.   Defendants contend McClure lacked  supervisory experience.  They argue that even though McClure testified he supervised as many as thirteen building engineers in his position as preventative maintenance foreman, the building engineers worked in their respective schools while McClure worked primarily from his truck and later from an office at the MOD.[15]  Defendants point out that McClure argued he did not supervise Jeneen Housdon[16] in practice in part because she, like the building engineers, worked at locations away from him.[17]  Mr. McClure testified he did performance evaluations on the building engineers but was not responsible for disciplining them.[18]  Defendants submit evidence which shows that the performance appraisals for eight building engineers completed during the time period from 1999-2007 were signed by Yarberry's predecessor,  Steve Hayes.  Those appraisals were reviewed by MOD director Wayne Adams or his predecessor Douglas Eaton.[19]  Effective July 1, 2007, school principals assumed direct

---

[15]Defs.' Reply Br. in Supp. Mot. Summ. J., Ex. X-1 (McClure Dep.) at 53-4, 138.

[16]Yarberry identified Housdon as "Janine Houston" while McClure calls her "Jeneen Housdon." Pls.' Add'l Genuine Issues of Material Facts (doc. 41) at ¶12 and Pls.' Resp. in Opp'n to Mot. Summ. J., Ex. 1 (McClure Aff.) at ¶ 3.

[17]Pls.' Resp. in Opp'n to Mot.Summ.J., Ex 1 (McClure Aff.)  at ¶ 3.

[18]Defs.' Reply Br. in Supp.M.Summ.J., Ex. X-1 (McClure Dep.) at 34.

[19]*Id*., Exs. EE, FF, GG, HH, II, JJ, KK, and LL.

supervision of the building engineers assigned to their schools.[20]  Defendants argue that because McClure did not evaluate or discipline the building engineers or formally supervise them, he cannot show he possessed five years supervisory experience which was a required qualification. In reply, McClure presents quarterly observations prepared for a building engineer named John Payne dated from 2003 to 2006 and initialed by McClure as evidence that he supervised building engineers.[21]  He also submits letters from several building engineers who wrote about their experiences with McClure as their supervisor.

Defendants further argue that at the time of his interview, McClure did not demonstrate that he had skill or experience in HVAC and utilities automation or controls.  Mr. McClure testified that the resume he submitted with his application for the supervisor position did not include all of his relevant work experience.[22]  When asked what was not included in his resume, McClure gave three examples of some of his job duties that were left off his resume.  He testified that when he became assistant head custodian at Hall High School in 1985, he supervised at least 30 to 40 people.  He said that the head custodian or the school's administration was responsible for performance evaluations.[23]  Mr. McClure said his resume did not reflect that he taught himself to use a multi-task order system that he utilized from a laptop and printer in his work truck.[24]  He testified that he learned the system on his own when he worked at Fair High School

---

[20]*Id.*, Ex. MM.

[21]Pls.' Surreply in Opp'n to Mot. Summ. J., Ex. A.

[22]Defs.' Reply Br. in Supp. Mot. Summ. J., Ex. X-1 (McClure Dep.) at 136.

[23]*Id*. at 137.

[24]*Id*. at 138.

because he tried to stay on top of his craft even though "the school district did not provide [him] with what [he] needed at times."[25]  Lastly, McClure testified his resume did not reflect that he worked with HVAC for a year and "got better acquainted with the way the school district handles their heating and air work."[26]

In an affidavit filed in response to defendants' motion for summary judgment, McClure says he learned the same multi-task work order system during a work-related in-service while working as a foreman under Steve Hayes.  Mr. McClure also states in his affidavit that he had experience doing utilities automation in the 1990s while he was a building engineer at J.A. Fair High School.[27]  Defendants point out that McClure did not mention this during his deposition when he was asked about relevant work experience that does not appear on the resume.  In fact, McClure testified that Adams "knows nothing about what I know"[28] but McClure further testified that between his resume and his interview with Adams, all his qualifications were made known.[29]

Even if McClure would establish a *prima facie* case of discrimination, defendants state Yarberry was hired because he was more qualified.  Separate defendant Yarberry testified he had experience with maintaining automatic controls for building systems, including the hospital's

---

[25]*Id.* at 139.

[26]*Id.*

[27]Pls.' Resp. in Opp'n to Defs.' Mot. Summ.J., Ex. 1 (McClure Aff.) at ¶ 2.

[28]Defs.' Reply Br. in Supp. Mot.Summ.J., Ex. X-1 (McClure Dep.) at 138.

[29]Pls.' Resp. in Opp'n to Defs.' Mot. Summ. J., Ex. 2 (McClure Dep.) at 143.

HVAC, lighting , and power plant equipment.[30] Adams testified he had no evidence at the time

he interviewed McClure that he had substantial experience with computerized work order

systems or experience with computerized energy/utility management.[31]  Mr. McClure argues

Adams should have been aware of McClure's qualifications because Adams had worked in the

MOD since 1983 and had been the director since 2006.  The Court finds McClure presents no

evidence from which a jury could find that Adams' decision not to promotion McClure was

based on his race.  The evidence is undisputed that Adams believed Yarberry had more

experience in computerized utilities/energy management than McClure.

*Constructive Demotion*

Plaintiff McClure asserts that his re-assignment from supervising building engineers to

supervising a preventative maintenance crew was a constructive demotion based on illegal

discrimination.  The Court analyzes a constructive demotion claim in the same way as a

constructive discharge claim.  *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 717

(8th Cir. 2003).  "A plaintiff claiming constructive discharge must show that a reasonable person

would have found the conditions of employment intolerable and that the employer either

intended to force the employee to resign or could have reasonably foreseen that the employee

would do so as a result of its actions.  Additionally the plaintiff must subjectively perceive the

environment to be abusive." *Id.* (internal citations and quotation omitted).  Mr. McClure presents

no evidence that a reasonable person would have considered the conditions of his new

assignment intolerable.  He  remained a foreman in charge of a three person crew responsible for

---

[30]Defs.' Mot. Summ. J., Ex. BB  (Yarberry Dep.) at 11.

[31]Defs.' Reply Br. in Supp. Mot. Summ. J., Ex. K (Adams Dep.) at 74-5.

maintenance and repairs.  There is no evidence that the reassignment was intended to cause McClure to resign.  According to Yarberry, there was a "redundancy in the supervision with the building engineers in that the respective principals have direct supervision of these individuals" and McClure's talents and experience were "underutilized."[32]  The Court finds defendants are entitled to summary judgment on McClure's constructive demotion claim.[33]

*Retaliation*

Plaintiff McClure alleges his reassignment was in retaliation for his filing an EEOC charge of discrimination over Yarberry's decision to move him out of his office.  To establish a retaliation claim, a plaintiff must show that he suffered an adverse employment action. "'An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.'  This might include  '[t]ermination, cuts in pay or benefits, and changes that affect an employee's future career prospects,' as well as  'circumstances amounting to a constructive discharge.'  'Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not' rise to the level of an adverse employment action." *Clegg v. Arkansas Dept. of Correction*, 496 F.3d 922, 926 -927 (8th Cir. 2007)(internal citations omitted).  Mr. McClure fails to establish his reassignment was an adverse employment action.

Further, McClure fails to show a causal connection between his reassignment and his EEOC charge.  There is no evidence Yarberry was aware on the morning of Friday, January 22,

---

[32]Defs.' Mot. Summ. J., Ex. J (Yarberry Aff.), Ex. 1.

[33]To the extent he asserts such a claim, the Court finds McClure fails to present evidence to support a finding that Yarberry's decision to move him to a smaller office was a constructive demotion.

2010, that McClure had filed an EEOC charge that same Friday afternoon after McClure's shift had ended.  Even if, as McClure says, Yarberry informed McClure of his reassignment on the following Monday, January 25, 2010,  there is no evidence that Yarberry or anyone with the LRSD received notice of the charge McClure had filed the Friday before.

Even if McClure could establish a *prima facie* case of retaliation, defendants have come forward with a legitimate reason for creating the new preventative maintenance crew.  According to Yarberry's letter dated January 22, 2010, he wanted to "start a more comprehensive and practical approach to the way this department maintains this districts['] facilities, particularly the school buildings."[34]  As stated previously, since 2007, school principals have been charged with supervising the building engineers assigned to their schools.

As to McClure's claim that Yarberry's failure to replace a member of his preventative maintenance crew was in retaliation for filing his EEOC charge, McClure fails to establish that he suffered an adverse employment action.

**Kem Austin**

Plaintiff Kem Austin began working for the LRSD in Plant Services in 1987 as a substitute  employee.  After working eighteen months as a driver/laborer, Austin got a full-time job doing custodial work at an elementary school.  He now works as a trade specialist and supervises a six-person crew made up of five blacks and one Hispanic.  He complains that he supervises more people than most of the white foremen and that all the other trade specialists crews are treated better than his in terms of pay and other conditions of employment.  He seeks "foreman designation, equalization of the work assignments and fair treatment for his minority

---

[34]Defs.' Mot.Summ.J., Ex. J (Yarberry Aff.), Ex. 2.

work crew."  Compl. at ¶ 25.

Plaintiff Austin is paid on a pay grade 51.  He testified he has topped out on the pay scale and that every trade specialist who is at step 20 makes the same amount of money as he.   He testified that when he began working for the LRSD he had to start out at step 1 whereas when white people were hired, their prior experience was taken into account and they started out in the middle of the pay scale.  Even though no one in the MOD is paid on pay grade 53, Austin testified he should be paid at a grade 53, the grade at which supervisors formerly were paid.   He said supervisors now are paid on a pay grade 55, that no one in the MOD is paid on a grade 53, and that "there should be  some people that are assistants to the foreman who are on that scale."[35]  He admits that prior to filing the lawsuit before the Court, he never requested a change of his job title to foreman.[36]

In *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012), the Eighth Circuit held that a plaintiff proves the fourth element of a *prima facie* case by showing comparators are similarly situated in all respects.  "To be similarly situated, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Wierman v. Casey's General Stores,* 638 F.3d 984, 994 (8th Cir. 2011)(internal citation and quotation omitted).  Plaintiff Austin presents no credible evidence that similarly situated white employees are paid at a grade 53, and therefore, he fails to establish a *prima facie* case of race discrimination as to his pay.

**Damieon Jackson**

---

[35]*Id.*, Ex. L (Austin Dep.) at 26.

[36]Pls.' Br. in Supp. Resp. to Mot. Summ. J. at 12.

Plaintiff Damieon Jackson started working for the LRSD in 1991 as a substitute on the mechanics' crew.  On the mechanics crew, he delivered weed eaters, lawn mowers, trucks and vacuums to schools throughout the LRSD.  After working as a substitute for about three years, Jackson became a permanent employee and began working on the paint crew as a trade helper.  After about one year, Jackson was promoted to trade employee where he worked on the preventative maintenance crew under foreman Harold Jumper.[37]

He alleges that in late 2009, defendants Adams and Yarberry moved him from a preventative maintenance lock crew where he was the only black employee to the boiler room crew that was headed by McClure.  Plaintiff Jackson alleges that by moving him, defendants demoted him and "created a five person all white section called the 'p.m. crew' . . ." [38]  He asserts the move was a demotion because he would have had an opportunity to move up in the lock crew when a locksmith, Fred Cato, retired in 2011.  He says he applied for the locksmith job in 2004 but Cato, a white person, was selected.  Plaintiff Jackson believes he was not selected because of his race.[39]  Plaintiff Jackson admits that the last position for which he formally applied was locksmith in 2004 and that the claim is time-barred.[40]

As noted, Jackson claims defendants' decision to transfer him from the lock crew denied him an opportunity to advance to Cato's locksmith position.  He testified that Glenn Robinson, a

---

[37]Defs.' Mot. Summ. J., Ex. W (Jackson Dep.) at 5, 9-10.

[38]Compl., ¶ 17.

[39]Defs.' Mot. Summ. J., Ex. W (Jackson Dep.) at 30-31.

[40]Pls.' Br. in Supp. Resp. to Mot. Summ. J., at 12.

white employee who was on the "pm" or preventative maintenance crew,  replaced Cato.[41]

However, Adams said  Cato's locksmith position was eliminated after he retired and his duties

were absorbed by the remaining members of the preventative maintenance crew.[42]

To establish a *prima facie* case of discrimination for a failure-to-promote claim, a

plaintiff must show he was qualified and applied for a position and that a similarly-situated

employee, not a part of the protected group, was promoted instead.  *Jackson v. United Parcel*

*Serv.*, 643 F.3d 1081, 1086 (8th Cir. 2011).   Because Jackson cannot establish that he applied for

an available position and that the position was filled by someone outside the protected class, his

denial of opportunity/failure-to-promote claim fails .

### Bob H. Milsap

Plaintiff Bob H. Milsap is employed in the MOD as a small engine mechanic.  He is a

trade specialist and his salary for the 2011-12 school year was $51,504.00.[43]  He was first

employed by the LRSD in 1979 as a laborer.  In 1997, he began working in the "black mechanic

department."[44]  His supervisor was LeMon McCoy, who retired in 2009.  Plaintiff Milsap alleges

he was next in line to succeed McCoy as foreman, and was interviewed for the position.  He

alleges defendants decided to leave the position vacant and reassigned Milsap to work under

Yarberry.  Plaintiff Milsap complains that when white supervisors are reassigned, retire, or die,

they are replaced by a white person, but the same does not happen when the supervisor is black.

---

[41]Defs.' Mot. Summ. J., Ex. W (Jackson Dep.) at 15.

[42]*Id*., Ex. I (Adams Aff.) at ¶ 6.

[43]*Id*.,  Ex. G (Milsap Contract)..

[44]Compl. at ¶ 19.

He claims defendants' decision not to replace McCoy was racially motivated.[45]

Defendant Adams states he decided not to fill McCoy's position because the mechanics department had only four employees and instead of hiring a supervisor, Adams hired another mechanic, Jody Castleberry.   Mr. Castleberry is a certified mechanic and his position is a grade 51, the same as Milsap's.  Mr. McCoy's position was a grade 54.  Defendant Adams said his decision was based on cost savings.  He points out that he also decided not to fill an electrical foreman position after the person holding that position resigned in 2010.[46]

Plaintiff Milsap asserts he was the most qualified person for the foreman position because he had the most years of experience.  He argues Adams' cost-savings rationale for eliminating the foreman position is not credible because in a memo written in January 2010, when he sought approval of a request to eliminate the foreman position and replace it with a mechanic trade specialist, Adams did not mention saving money but instead said approval of the request would allow him to fully staff the crew.[47]   Plaintiff Milsap argues these reasons conflict and are evidence of pretext.[48]  Defendants respond that Yarberry's testimony that the actual machine work Castleberry performed was no different than the work McCoy had performed, including working on heavy equipment, shows that Adams' decision was based on cost savings.  The newly-hired Castleberry performed the same work as the former foreman McCoy at a lower classification and for less money.

---

[45]*Id.*

[46]Defs.' Mot. Summ. J., Ex. I (Adams Aff.),  ¶¶ 7-9.

[47]Pls.' Resp. in Opp. to Mot. Summ. J., Ex. 6 (Adams Dep.), Exs. 2-4).

[48]Pls.' Br. in Supp. of Resp. to Mot. Summ. J. at 14.

The Court finds Milsap fails to present credible evidence that defendants' stated reasons for eliminating the foreman position were pretextual and that the real reason was to deny him a promotion because of his race.

**Ira Nicholson**

Plaintiff Nicholson has worked for the LRSD since 1991.  He was hired as a substitute custodian; now he is employed as a custodian at the MOD facility where his responsibilities include washing mops and cleaning the warehouse and offices.  He sometimes substitutes for custodians in the schools.  He complains defendants did not afford him an opportunity for promotion in spite of his successful job performance, but concedes he did not formally apply for a promotion. [49]

He also alleges defendants discriminated against him by paying him less than a comparator, Mary Robinson, but submits no evidence to support his allegation.  *See Chappell, supra*, 675 F.3d at 1119; *Wierman, supra*, 638 F3d at 994 ("individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances").  The Court finds defendants are entitled to summary judgment as a matter of law on Nicholson's race discrimination claim.

**Brien Harris**

Plaintiff Brien Harris is employed by the LRSD as a laborer/driver in the MOD.  He is responsible for deliveries, small engine repairs, and regular mechanical work.  His position is classified as a grade 40.  The District is paying his tuition for courses he is taking that will lead

---

[49]*Id*. at 12-13.

to a certificate in automotive technology.  Plaintiff Harris  testified he was told he would get a trade specialist job when he gets his certificate.

In 2009, when LeMon McCoy retired, defendants decided to hire a trade specialist and Harris applied for the position.  Defendants hired Joseph Castleberry, a white man, who is a certified auto mechanic with thirteen years experience as an auto mechanic.  Plaintiff Harris alleges defendants denied him the promotion because of his race.  He complains that the defendants have a practice of employing white persons from outside the LRSD into trade or trade specialist position and then providing them with education, if necessary.  On the other hand, Harris says, defendants require black employees to have prior training before placing them in trade or trade specialist positions.

Defendants argue their reasons for hiring Castleberry are his experience and his certification.  While Harris's only mechanical experience is in the MOD with small engines like lawn mowers, weed eaters, and leaf blowers, Castleberry is certified in Hunter brakes/wheel alignment, engine maintenance, brake maintenance, electrical maintenance, and engine overhaul/rebuilds.  Plaintiff Harris responds that the position announcement did not require any kind of certification or license nor did it mention experience with heavy equipment.  Further, Harris testified that his regular mechanical work includes repairs on truck engines,[50] that he has been performing these duties for fourteen years at the LRSD and, therefore, he is more qualified than Castleberry.

 The fact that a plaintiff "may have been capable of filling the role of [the position], or that he has specific strengths as a candidate, does not show pretext."  *Barber v. C1 Truck Driver*

---

[50]Pls.' Resp. in Opp'n. to Mot. Summ. J., Ex. 7 at 7.

*Training, LLC,* 656 F.3d 782, 793 (8th Cir. 2011).  "To support a finding of pretext, [the applicant] must show that the [employer] hired a *less* qualified applicant."  *Torgerson v. City of Rochester,* 643 F.3d 1031, 1049 (8th Cir. 2011)(quotations omitted and emphasis in original). *See also Pierce v. Marsh,* 859 F.2d 601, 604 (8th Cir.1988) ("The mere existence of comparable qualifications between two applicants ... alone does not raise an inference of racial discrimination.").   The Court finds Harris  comes forward with no evidence that defendants' stated reasons for hiring Castleberry are a pretext for unlawful discrimination.

**Demetrius Chism**

Plaintiff Demetrius Chism was first employed by the LRSD in 1999 as a laborer/driver. He now works as a concrete helper allegedly without the title "trade helper."  He testified his typical day consists of cutting trees and moving furniture in and out of classrooms.  He says he works with plumbers and carpenters and helps with concrete jobs, such as installing benches on playgrounds.  Plaintiff Chism testified he does concrete work about one day out of five; the other four days he moves furniture in and out of schools, cuts down trees, runs the tractors, digs up stumps, puts tables together, and does anything else that needs to be done.[51]  As described by Chism, his duties are substantially similar to the duties performed by other laborer/drivers.[52]  He complains that defendants refuse to upgrade his job title and pay to reflect the work he performs.

Plaintiff Chism  testified he applied for a carpentry position in 2005 or 2006 but defendants hired a white person named Richard.  He said he applied for a position on the

---

[51]Defs.' Mot. Summ. J., Ex. O (Chism Dep.).

[52]*Id.*, Ex. P (Craig Dep.) at 9; Ex. Q (Daniels Dep.) at 10, 12, 16; Ex. R (Davis Dep.) at 4;  Ex. T (Harshaw Dep.) at 5-6; and Ex. V (Houston Dep.) at 6.

preventative maintenance crew in 2006 or 2007 but did not get the job.  Lastly, he testified he applied for a trade-level concrete position in 2007, that was filled by Gregory Higgins, a fellow plaintiff.

Plaintiff Chism admits he did not formally make an application for a carpenter position within the applicable statute of limitations.[53]  As to the preventative maintenance position, he offers no evidence as to who got the job or whether the position was filled.  The concrete position was filled by Higgins, a member of the same protected class.  Further, Chism offers no evidence that similarly-situated white person performing the work of a laborer/driver have the title and pay of trade helper.  The Court finds Chism presents no evidence from which a reasonable jury could find defendants unlawfully discriminated against him.

### Carolyn Craig

Plaintiff Carolyn Craig has been employed by the LRSD in the MOD as a laborer/driver since 1993.  She is part of the labor crew which performs odd jobs such as moving furniture, tearing down furniture, painting, hauling trees off and things of that nature.  She worked on the grounds crew and as a team leader on the grounds crew.  She had to transfer to the labor crew because of severe allergies.  Her job duties on the labor crew have remained consistent throughout her employment.

Plaintiff Craig alleges she applied for the position as custodian supervisor in 2006, was interviewed, but did not get the job.  She says the job has remained vacant and although she has consistently sought to fill the position, Yarberry told her in 2009 that there was no money in the budget for the position.  She alleges Yarberry hired a friend of his, Michael Ellis, as a control

---

[53]Pls.' Br. in Supp. of Resp. in Opp'n to Mot. Summ. J. at 12.

specialist, a position that did not previously exist.  She claims Ellis is paid a salary substantially

greater than hers and he also receives a travel stipend.[54]  Plaintiff Craig testified she does not

know what Ellis does for the LRSD[55] but she believes she was denied the supervisor position

because she is black.  She also complains that she should be paid ay the trade level position.

According to Adams, Ellis is a controls technician for the HVAC department and

monitors and operates all of the computerized heating and air systems in the schools.[56]  His

position is not similar to the custodial supervisor position.   Hiring Ellis for a position that is not

similar to the custodial supervisor position does not create a genuine issue of material fact as to

whether the stated reasons for not filling the supervisor position is a pretext for race

discrimination.  The Court finds Craig fail to establish a genuine issue of material fact as to

whether she was denied the supervisor position because of her race.  There is no evidence that

the position was ever filled or that the reason advanced for not filling the position, budgetary

concerns, is a pretext for discrimination.[57]  Likewise, Craig presents no evidence of

discrimination in the title and pay assigned to her work for the LRSD.

**Anthony Oates**

The LRSD hired Anthony Oates in 1998 as a custodian.  He transferred to the MOD in

1999 as a trade helper in the plumbing department.  Initially, Oates worked with another

plumber.  In 1999, Oates began attending classes to get his plumbing license.  The LRSD paid

---

[54]Compl. at ¶ 23a.

[55]Defs.' Mot. Summ. J., Ex. P (Craig Dep.) at 20-21.

[56]*Id*, Ex. K (Adams Dep.)  at 45-46.

[57]Plaintiff Craig admits that her allegation that she was denied a warehouse specialist position is time-barred.  Pls.' Br. in Resp. to Defs.' Mot. Summ. J.  at 15.

for his schooling the first time he took the exam.  He paid for his own classes the second time.

In approximately 2004, Oates finished school and got his plumber's apprentice license.[58]

There are three other plumbers in the plumbing department.  Two are white and hold

master plumber's licenses and the third, Roger Collins, is black.  Plaintiff Oates does not believe

Collins has an apprentice license.  In 2009, Oates's position was reclassified from trade helper to

tradesman.  He complains he should have been classified as a tradesman as soon as he got his

apprentice license in 2004 and defendants failure to do so was because of his race.  He further

alleges white employees were assigned directly into trade specialist positions and are paid more

than he.

Plaintiff Oates fails to establish a claim for discrimination.  There is no evidence that

plumbers are automatically promoted to tradesman position upon obtaining apprentice licenses.

The two white plumbers hold superior licenses to his, and Oates cannot show that any white

employee who holds an inferior license in any trade is paid more than he.  Employees in other

trades who hold positions as trade specialists are not similarly situated to those in the plumbing

trade.

### Randy Chapman[59]

Plaintiff Randy Chapman has been employed by the LRSD for approximately sixteen

years as a laborer/driver.[60]  He alleges defendants have not paid him commensurate with the

---

[58]Defs.' Mot. Summ. J., Ex. Z (Oates Dep.) at 5; Pls.' Resp. to Defs'Statement of Material Facts Not in Dispute at ¶¶ 148-151.

[59]The Complaint lists Randy "Chatman" as a plaintiff.  However, at his deposition, "Chatman" identified himself as Randy Chapman.  The Court, therefore, directs the Clerk to correct the spelling of Randy Chapman's name in the style of the case.

[60]Defs.' Mot.Summ.J., Ex. N (Chapman Dep.) at 4.

work assignments he performs.[61]  He describes a typical day as going from one school to another, hauling trash, patching holes in a blacktop parking lot, and replacing signs in a parking lot.[62]

Defendants argue Chapman's pay claim is nothing more than an attack on the LRSD's legitimate business decision to set the pay scale for its laborer/drivers.  Plaintiff Chapman presents no evidence that a similar situated white employee is paid more for performing the same or similar duties.  The Court finds Chapman fails to establish a genuine issue of material fact that defendants acted in a discriminatory manner in setting his pay.

**Malachi Harshaw**

Plaintiff Harshaw has worked for the LRSD for about twelve years as a laborer/driver. He testified he performs different duties, from cutting trees, to moving furniture, to working on playground equipment.[63]  He claims he gets paid less for what he does and does a lot of work for which he is not paid.  He complains defendants will not change his title so that he can get paid more.[64]

Plaintiff Harshaw fails to come forward with any evidence that the LRSD pays similarly situated white employees more for performing the same duties as he.  Therefore, the Court finds

---

[61]Although he alleged in the complaint that he was denied promotions, Chapman concedes that he did not formally apply for a promotion within the applicable statute of limitations.  Pls.' Br. in Supp. of Resp. to Mot. Summ. J. at 12.

[62]Defs.' Mot. Summ. J., Ex. N (Chapman Dep.) at 7-8.

[63]*Id*., Ex. T(Harshaw Dep.) at 5-6.

[64]*Id*. at 10-11.

defendants are entitled to judgment as a matter of law on Harshaw's race discrimination claim.[65]

**Roy Daniels**

Plaintiff Roy Daniels testified he has been working as a laborer/driver for the LRSD for eleven years.  He typically drives a pick-up truck to perform assignments such as cutting trees and moving pea gravel and cross timbers. Sometimes he drives a larger truck for hauling furniture.[66]  He testified that in 2008 he talked to Steve Hayes, Yarberry's predecessor, about a carpenter trade helper's position and that Hayes told him he did not have to apply for the positions because Hayes said "he had me."[67]  Plaintiff Daniels testified Hayes claimed the position was phased out but Daniels says Hayes hired a white person whose name he does not recall, who was not around for a long time, and was not replaced.[68]

According to defendants, the LRSD's policy is to advertise all positions it chooses to fill and an employee will not be considered for a vacancy unless he applies for it.[69]  Separate defendant Adams states that since he became an employee of the LRSD in 1983, the MOD has never had a carpenter trade helper's position.  The last time there was a vacant position in the carpentry department was in January 2005 when Richard Collier was promoted from his carpentry trade position to carpentry trade specialist.[70]  Any claim that Daniels may have had to

---

[65]Plaintiff Harshaw admits he has not formally applied for a promotion within the applicable statute of limitations. Pls.' Br. in Supp. of Resp. to Mot. Summ. J.at 12.

[66]Defs.' Mot. Summ. J., Ex. Q (Daniels Dep.) at 5, 10, 12.

[67]*Id*. at 6.

[68]*Id*. at 7.

[69]*Id*., Ex. I (Adams Aff.) at ¶12.

[70]*Id*. at ¶¶ 13-14.

those positions in 2005 are time-barred.

Plaintiff Daniels also alleges defendants treat him unfairly as to his job title and pay, yet he submits no evidence that defendants pay or award different job titles to white employees who are performing similar duties.  The Court finds plaintiff fails to establish evidence of a *prima facie* case of discrimination.

**Gregory Higgins**

Plaintiff Gregory Higgins has been employed by the LRSD since 2005 as a brick cement finisher.  For the 2011-12 school year, he was paid at grade 49, step 12.  He is considered a tradesman and his job duties include brick laying, cement finisher, plastering, and tile setting. He works in the labor department of the MOD.  When there is no mason work to perform, Higgins assists the labor crew.  There are no other brick layers, cement finishers or masons employed by the LRSD.[71]  He complains his classification does not reflect his skills as a bricklayer and that defendants should raise his job classification to trade specialist.  He testified that when he worked in the union, he was classified as a journeyman bricklayer, which is on the top of the pay scale.  He said he thought the LRSD was hiring him at the highest scale.[72]

Plaintiff Higgins compares himself to Jody Castleberry, a white person, who was hired as an auto mechanic and is paid at the higher, trade specialist rate.  Plaintiff Higgins testified that the LRSD hired a white person as a locksmith and some roofers and paid them as trade specialists.   He complains that the job duties of these white people do not require the skill level

---

[71]Defs.' Statement of Material Facts Not in Dispute, ¶¶ 71-76.

[72]Defs,' Mot. Summ, J., Ex. U (Higgins Dep.)  at 14-15.

that he must possess to perform his bricklayer/cement finisher job.[73]  In response to defendants' motion for summary judgment, Higgins argues the LRSD classifies some carpenters and painters as trade specialists and asserts defendants' decision to classify his position as a tradesman is racially motivated.

According to employment records filed by defendants, Higgins replaced Kenneth Craig, who was paid at the same grade as Higgins.[74]  Although Higgins identifies white employees who are classified at the higher trade specialist pay grade, there is no evidence that they perform similar job duties to Higgins, the only mason or bricklayer employed by the LRSD.  Of the six painters and six carpenters to which Higgins compares himself, seven have the same classification as he does, and  two of the three trade specialists in the carpentry department are black.[75]  Because he fails to present evidence to show that similarly situated white employees were paid at a higher grade than he, Higgins cannot establish a *prima facie* case of race discrimination.  His disagreement with defendants' classification of his position is not evidence of discrimination.

**Darrell Davis**

Plaintiff Darrell Davis has been employed by the LRSD since 1982.  He works as a laborer/driver and his job duties include making repairs around the schools and on the playgrounds.[76]  He was interviewed for the position of team leader on the grounds crew and was

---

[73]*Id*. at 16-17.

[74]*Id*., Ex. C (Craig Employment Record).

[75]Defs.' Reply to Pls.' Resp., Ex. DD.

[76]Defs.' Mot. Summ. J., Ex. R (Davis Dep.) at 4.

offered the job in June 2007.  According to the evidence, Davis wanted to negotiate for a higher

salary, and when he did not timely respond to the offer made, the LRSD withdrew it.[77]  Plaintiff

Davis presents no evidence that the salary offered was based on race discrimination.

He also testified that he and other members of the labor crew do work similar to

employees in other departments such as preventative maintenance but get paid less money.  The

Court finds Davis fails to establish a case of race discrimination as he cannot show he is

similarly situated to white employees who perform the same work and are paid at a higher rate.


**Bernard Roseby**

Plaintiff Roseby has been employed by the LRSD in the MOD as an electrician since

2000.  When he was hired, he worked with another electrician, Richard Buckalew.  He worked

with Buckalew for about five years.  Since then, he has worked mainly by himself.

Approximately four years after he started as an electrician, Roseby attended school and obtained

an apprentice electrician license.  The LRSD paid for Roseby to attend school.  Plaintiff Roseby

twice sat for the test to get his journeyman's license but failed the test both times.  His position is

classified as a tradesman.

The three other electricians in the MOD are white.  They each hold master or

journeyman electrician licenses and their positions are classified as trade specialist.   Plaintiff

Roseby complains that even though he is not certified as an electrician, he has been doing the

work of a journeyman electrician for the past eleven years without receiving the pay of a trade

specialist.  He wants to be grandfathered in as a certified electrician and receive the pay of a

---

[77]*Id.*, Ex. D (Letter to Davis); Pls.' Resp. in Opp. to Mot. Summ. J., Ex. 10 (Davis Dep.).

trade specialist.  He complains that other employees who work as carpenters and painters have no licenses or certifications but are classified as trade specialists.  He testified that a white person, Jody Castleberry, who is a mechanic, was hired in as a trade specialist.

Defendants state that the requirements and distinctions of each classification are different for each trade.[78]  Some carpenters and some painters are classified as tradesmen and some as trade specialists.  Painters and carpenters are not required to hold licenses.  Defendants argue that in order to be a trade specialist, an electrician in the MOD must have a journeyman license or a master license.  Plaintiff Roseby admits that a specialist in the electrical department is not the same as a specialist in another department.[79]

The  Court finds there is no evidence that similarly situated persons not in the protected group are treated more favorably than Roseby.  Therefore, defendants are entitled to summary judgment on Roseby's claim.

**Denious Houston**

Plaintiff Denious Houston has been employed at the LRSD as a helper to separate plaintiff Kem Austin who is an equipment specialist.  He complains that when Austin was on sick leave between September 2009 and March 2010, he filled in for Austin but was not paid for his work performed outside his labor grade.  He claims other similarly situated white employees were paid for such work.

Plaintiff Houston admits that his work did not change while Austin was on sick leave and

---

[78]Defs.' Mot. Summ. J., Ex. I (Adams Aff.) at ¶ 10.

[79]*Id.*, Ex. AA (Roseby Dep.) at 13.

that he never formally applied for a promotion.[80]  The Court finds Houston fails to present evidence that a similarly situated white employee was treated more favorably than he.

### Frederick Williams

Plaintiff Frederick Williams alleges he has worked at the LRSD for sixteen years as a laborer/driver and, in spite of applying on numerous occasions, he has never received a promotion.   He also claims defendants discriminated against him as to his pay and he seeks a promotion to trade or trade specialist classification.[81]  Defendants seek summary judgment based on the fact that Williams has failed to produce any facts in support of his claims of discrimination.  Plaintiff Williams admits he did not show up for his scheduled deposition in this case and asks that any dismissal of his claims be without prejudice.[82]   The Court finds Williams's claim should be dismissed without prejudice.

### Calvin Carter

Plaintiff Calvin Carter, who says he has worked as a paraprofessional and/or computer technician for the LRSD for about 20 years, complains that in 2003 his salary was cut "for no legitimate reason."[83]  He also alleges that in October 2009, he applied for the position of electrical foreman in the MOD but did not receive an interview.   The position was posted again in early 2010 and Carter says Yarberry interviewed him prior to the end of the 2009-10 school year.  He said he had a second interview in July of 2010 but has not heard back from Yarberry

---

[80]Defs.' Mot. Summ. J., Ex. V (Houston Dep.) at 8, 11-12, 16-17.

[81]Compl. at ¶ 33.

[82]Pls.' Br. in Supp. of Resp. in Opp'n to Mot. Summ. J. at 16.

[83]Compl. at ¶ 29.

whether a decision has been made.[84]  Plaintiff Carter testified that he does not know who else applied for the position or whether or not the position was filled.[85]  He said that based on his second interview, which was conducted by five people, including Yarberry, Adams, two black persons, and another person, he believes Adams would have hired him if Yarberry had agreed. Plaintiff Carter alleges Yarberry put the position on hold because he did not want to fill it with a black person.[86]

To the extent Carter claims race discrimination when his salary was cut in 2003, that claim is barred by the statute of limitations.[87]  As to his claim that he was denied the electrical foreman position in 2009 and in 2010 because of his race, Carter presents no evidence that the position remains unfilled because of race discrimination.  Defendants are entitled to summary judgment as to Carter's claims.

**Working Conditions**

Plaintiffs allege the MOD facility is divided into three separate sectors: one is for employees of whom 47 of 50 are white and is located on the facility's east side; the second sector is for employees of whom 47 of 50 are black and is located on the facility's west side; and the third sector is in the middle and consists of two parts: (1) the seven-member management office, which is all white, and several other offices which are mixed but house less than six

---

[84]Compl. at ¶ 29a.

[85]Defs.' Mot. Summ. J., Ex. M (Carter Dep.) at 21.

[86]*Id*. at 20-22.

[87]*See Jackson v. Homechoice, Inc.*, 368 F.3d 997 (8ᵗʰ Cir. 2004)(4-year statute of limitations for claims under 42 U.S.C. § 1981; *Ketchim v. City of West Memphis*, 974 F.2d 81 (8ᵗʰ Cir. 1992)(§1983 claims governed by State's general personal injury statute of limitation, which in Arkansas is three years).

people, and (2) the bookkeeping unit which is mostly black.[88]

Plaintiffs allege the white sector is well-maintained and air-conditioned while the black sector is not. Plaintiffs allege that historically MOD supervision is racial, with two black foremen supervising racially identifiable work crews and eight white foremen  supervising black and white work crews.[89] Plaintiffs further allege the white sector workers get the new equipment, including vehicles, while the black sector workers get used equipment.[90]

Plaintiff McClure testified that the west end of the shop is occupied by the mechanics, labor and grounds crews.[91]  It consists mainly of an automotive garage where the MOD's mechanics repair LRSD-owned vehicles, including pick-up trucks, dump trucks, and riding mowers.  The mechanics also repair other lawnmowers, weed eaters, and other motorized equipment in the west end of the maintenance shop.  There is also a storage area for the equipment used by the laborer/driver crew like two-wheelers and flat dollies.[92]

The west end of the shop contains two offices, one used by the MOD's four mechanics, Terry Draper, Jody Castleberry, Brien Harris, and Bob Milsap, and the other by the labor foreman, Larry Adrow.  The west end is where the laborers/drivers and grounds crew tend to congregate as they await their assignments for the day.  They spend most of their day out in the schools, filling work orders.  They typically return to the shop for a lunch break, where they are

---

[88]Compl., ¶8.

[89]*Id.* at ¶¶ 9-10.

[90]*Id.* at ¶ 11.

[91]Defs.' Mot. Summ. J., Ex. X (McClure Dep.) at 111.

[92]Pls.' Resp. to Defs.' Statement of Undisputed Fact, ¶¶ 119-120.

free to relax in the lounge area in the east end or "white sector" of the shop and eat lunch.  After lunch, they return to the field to complete work orders.  They return to the shop in time to clock out at 4:00 p.m.[93]

Between the east and west wings of the shop are the administrative offices of the MOD. The offices for the plumbing, carpentry, and electrical foremen are located at the east end of the shop.  The east end is where the roofing, plumbing, carpentry, electrical, painting, and HVAC crews tend to congregate.  Like the west end of the shop, the east end contains storage areas for the tools used by the various crews on the east end.  Like the laborer/drivers and grounds crews, the painters, plumbers, carpenters, electricians, and HVAC are rarely in the shop because they are out filling work orders.  There are white employees on the mechanic crew who work on the west end of the shop, and there are black employees on the painting, carpentry, plumbing, electrical, and HVAC crews whose foremen have offices on the east end of the shop.  A break room with a snack machine and flat-screen television is also located on the east end.  It is available for use by any employee of the MOD regardless of his or her work assignment.  White and black employees work alongside each other on a daily basis.[94]

In each department, the foreman decides which employees are assigned to use a particular piece of equipment on a daily basis.  The foreman also decides when new equipment is needed.  The foreman makes a request to the MOD supervisor for new equipment who usually approves the request.[95]

---

[93]*Id*. at ¶¶ 121-127.

[94]*Id*. at ¶¶ 128-135; Defs.' Mot. Summ. J., Ex.L  (Austin Dep.) at 20.

[95]Pls.' Resp. to Defs.' Statement of Facts at ¶¶ 136-138.

The foreman for the laborer/drivers is Larry Adrow.  There are three new pickup trucks in the labor department.  The labor department received the new trucks at the same time the departments on the east end of the shop received new trucks.  One of the new trucks at the east end of the shop was assigned to plaintiff Anthony Oates.  All three new pickup trucks in the labor department at the west end are assigned to black employees.[96]  Plaintiff Ira Nicholson, who cleans the shop, testified that the old trucks get sent down to the mechanics on the west end where they are repaired and given out.  He said sometimes the white employees get some bad trucks.[97]  The Court finds plaintiffs have presented no evidence that the physical arrangement of the MOD facility is unlawfully segregated.  They also have presented no evidence that vehicle assignments are based on race.

Plaintiffs also allege job segregation exists within in the MOD that leads to racial disparities in pay.  They assert there are 85 employees in the MOD.  Of the 26 who are trade specialists, only 5 are black.  Since 2007, the MOD has hired five trade specialists and all were white.  Further, there are only 2 black foreman.  The other remaining black employees in the MOD are classified as tradesmen and laborers.  All of the 19 employees on the labor and grounds crew are black except for one white employee and one Hispanic.  Plaintiffs argue this is evidence of racial disparity in compensation.

While statistical evidence may be evidence of discrimination, the plaintiff must also provide some context or analysis to support the statistics.  *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 n.5 (8th Cir. 2012).  In *Miller v. Weber*, 577 F.2d 75 (8th Cir. 1978), the plaintiff offered

---

[96]*Id*. at ¶¶ 139-142.

[97]Defs.' Mot. Summ. J. Ex. Y (Nicholson Dep.) at 20.

evidence showing that the National Guard had low employment rates for women.  The Eighth

Circuit held that the evidence was inadequate to establish plaintiff's sex discrimination claim:

> Statistical analyses can serve as indirect indications of discrimination where all
> citizens are on an equal footing.  In an employment situation, however, each
> member of the general populace is not on an equal footing.  To the contrary . . .
> 'this is not a case in which it can be assumed that all citizens are fungible for
> purposes of determining whether members of a particular class have been
> unlawfully excluded.'  It is the plaintiff's responsibility to produce a meaningful
> statistical comparison.  She failed to do so here.

*Id*. at 77.  *See also Bogren v. Minnesota*, 236 F.3d 399, 406 (8th Cir. 2000)(overall generic

employment statistics have little bearing on issue of pretext).

The Court finds plaintiffs fail to come forward with evidence supporting their claim that

defendants engage in race discrimination in their hiring or salary decisions.  Plaintiffs do not

show that there are similarly situated white employees who receive more favorable treatment.

IV.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment  [docket

entry 33] should be and is hereby granted.  Judgment will be entered accordingly.

DATED this 28th day of March, 2013.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE